# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| *In re* Subpoena to Non-Party Lindsey O. Graham in his official capacity as United States Senator,<br><br>in the matter of:<br><br>Special Purpose Grand Jury, Fulton County Superior Court Case No. 2022-EX-000024. | Case No. _____ |

## MEMORANDUM IN SUPPORT OF EXPEDITED MOTION TO QUASH BY UNITED STATES SENATOR LINDSEY GRAHAM

The Fulton County District Attorney wants to force U.S. Senator Lindsey Graham to testify as a witness about two phone calls he made in the process of fulfilling his duties as U.S. Senator.  In making these calls, after the election, Senator Graham was engaged in quintessentially legislative factfinding—both to help him form election-related legislation, including in his role as then-Chair of the Judiciary Committee, and to help inform his vote to certify the election.  Following his investigation, Senator Graham both voted to certify Joe Biden as "the legitimate President of the United States"[1] and co-sponsored a bill to amend the Electoral Count Act to correct flaws uncovered during his legislative factfinding.[2]

In at least three different ways, the Constitution and our laws prohibit the District Attorney's attempt to inquire into and interfere with Senator Graham's performance of his duties.  *First*, the Speech or Debate Clause—which our Framers thought "indispensably necessary" for the independence of the legislature, and ultimately for the "rights of the people," *Tenney v. Brandhove*, 341 U.S. 367, 373–74 (1951)—provides absolute protection against inquiry into Senator Graham's legislative acts.  *Second*, sovereign immunity prevents a local prosecutor from haling a U.S. Senator to face a state ad hoc investigatory body.  And *third*, even without

---

[1] 167 Cong. Rec. S31 (daily ed. Jan. 6, 2021).

[2] *See* https://www.lgraham.senate.gov/public/index.cfm/co-sponsored-bills.

those constitutional guarantees, the District Attorney has not met her burden of compelling this testimony, because she has not shown the "extraordinary circumstances" necessary to order a high-ranking federal official to testify.

## BACKGROUND

Georgia law allows its district attorneys to request what are known as "special grand jur[ies]," O.C.G.A. § 15-12-100(a), but the term "grand jury" in this context is a misnomer. Unlike the typical grand jury, this one cannot indict; all it does is investigate and issue non-binding recommendations. *Kenerly v. State*, 715 S.E.2d 688, 690 (Ga. 2011). Several months ago, Fulton County District Attorney Fani Willis requested and received such a special grand jury, for use as a tool to "investigate any and all facts and circumstances relating directly or indirectly to possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia." *See* Exhibit 1, Certificate of Material Witness Pursuant to Uniform Act to Secure the Attendance of Witnesses from Without the State, Codified in the State of Georgia as O.C.G.A. § 24-13-90 et seq., ¶ 1 (the "Certificate").

As part of her investigation, the District Attorney has already compelled Georgia Secretary of State Brad Raffensperger, Deputy Secretary of State Gabe

Sterling, former Secretary of State Chief Investigator Frances Watson, former Elections Director Chris Harvey, and others to testify before the special grand jury.[3]

Now the District Attorney wants Senator Graham to testify. To begin that process, the District Attorney filed an *ex parte* petition on July 5, claiming that the South Carolina Senator is "a necessary and material witness" to the Georgia body's investigation into "possible attempts to disrupt the lawful administration of the 2020 elections in the State of Georgia." Exhibit 2, Petition ¶¶ 1–2. The only reason she offered for this bold assertion was that, "[t]hrough both its investigation and through publicly available information," she had learned that Senator Graham "made at least two telephone calls to Georgia Secretary of State Brad Raffensperger and members of his staff in the weeks following the November 2020 election." *Id.* ¶ 2. In those telephone calls, she alleges, Senator Graham "questioned Secretary Raffensperger and his staff about reexamining certain absentee ballots cast in Georgia" and "made reference to allegations of widespread voter fraud in the November 2020 election in Georgia." *Id.* The District Attorney wants to hear more about "the substance of the telephone calls," the "logistics of setting up the telephone calls," and the Senator's motives for making them. *Id.* ¶ 3.

---

[3] *See* Tamar Hellerman, *Raffensperger testifies before Fulton grand jury probing 2020 elections*, The Atlanta Journal-Constitution (June 2, 2022).

Without notice to Senator Graham, the state-court judge supervising the special grand jury in Georgia issued an *ex parte* Certificate directed at Senator Graham in South Carolina. *See* Ex. 1. Senator Graham removed that proceeding to federal court in South Carolina, and then moved to quash. *See In re Graham*, No. 22-mc-00433. Rather than responding to the motion to quash, though, and unbeknownst to Senator Graham, the District Attorney sought to enforce a separate *ex parte* Certificate directed to the Superior Court of the District of Columbia.[4] Eventually, the parties agreed that the District Attorney would drop both of those Certificates, and Senator Graham would accept service of a subpoena (attached as Exhibit 3) in Georgia "without waiving any challenges or any applicable privilege and/or immunity," any of which would "be pursued in Fulton County Superior Court and/or the United States District Court for the Northern District of Georgia."[5]

Senator Graham has now filed his Notice of Removal under 28 U.S.C. § 1442(a), concurrently with this Motion to Quash.

---

[4] Senator Graham does not attach any filings presented to the D.C. Superior Court because he was not served with any such filings. In an impromptu and informal phone conference with the D.C. Superior Court, the District Attorney represented to Senator Graham and the court that the materials presented to the D.C. Superior Court related to attempts to compel Senator Graham to testify in Georgia.

[5] *In re Circuit Court Order to Appear for Non-Party Lindsey O. Graham*, No. 8:22-mc-0043-DCN (D.S.C. July 19, 2022) (Stipulation); *In re Circuit Court Order to Appear for Non-Party Lindsey O. Graham*, No. 1:22-mc-00068 (D.D.C. July 22, 2022) (Stipulation).

## ARGUMENT

This Court should quash the Certificate and Subpoena for three independent reasons. *First*, the Speech or Debate Clause of the United States Constitution protects Senator Graham from being "questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. *Second*, sovereign immunity precludes forcing a federal officer to testify before a state investigatory body. And *third*, the District Attorney has not demonstrated and cannot demonstrate the sort of "extraordinary circumstances" necessary to justify requiring a high-ranking government official to take time away from his duties to testify.

## I.   THE SPEECH OR DEBATE CLAUSE PROTECTS SENATOR GRAHAM FROM HAVING TO TESTIFY BEFORE THE SPECIAL GRAND JURY.

The Constitution guarantees that Senator Graham "shall not be questioned in any other Place" for his "Speech or Debate," U.S. Const. art. I, § 6, cl. 1, which the Supreme Court has interpreted "broadly" to include any actions taken "within the sphere of legitimate legislative activity," *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). Under first principles and longstanding precedent, Senator Graham's phone calls—investigating and exercising his oversight responsibilities as Chair of the Senate Judiciary Committee and as a sitting United States Senator— readily qualify as constitutionally protected "Speech or Debate." Yet the District

Attorney would have this Court force Senator Graham to submit to questioning on these topics as a witness, essentially so that the District Attorney can inquire into whether those were the Senator's true motives—to determine, that is, whether the Senator was *really* engaged in legislative activity in the run-up to his vote to certify President Biden's election.  The District Attorney's apparent suspicions are baseless, but even assuming otherwise, the Speech or Debate Clause was designed to prevent exactly the sort of examination she proposes.

    **1.**  The Framers contemplated just this sort of situation when they insisted on protecting Senators from having to testify about their legislative activity.  "The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators"—to guarantee, in short, that "legislative function[s] . . . may be performed independently."  *Eastland*, 421 U.S. at 501; *see Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967).  By "enabling these representatives to execute the functions of their office without fear" of interference from prosecutors, grand juries, or courts, the Framers understood that the "rights of the people" would, in turn, be protected. *Tenney*, 341 U.S. at 373–74 (collecting historical sources).  Legislators would not have to endure "the cost and inconvenience and distractions" of grand-jury

testimony all over the country based on nothing more than "speculation as to motives" or the "conclusion of [a state-actor] pleader"; our legislators would instead be free from inquiry about all matters within their sphere so that they can best serve the people. *Id.* at 377. Else, there would be nothing to stop any state or local official from investigating—or "intimidat[ing]" under the veneer of investigating—Senators or Representatives with which they disagree. *United States v. Johnson*, 383 U.S. 169, 178–79 (1966); *see Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015).

The Framers thus viewed the Speech or Debate Clause as an "indispensable" privilege, and they meant for it to apply not "strictly, but liberally." *Kilbourn v. Thompson*, 103 U.S. 168, 202–03 (1880); *see Eastland*, 421 U.S. at 501. It does not turn on the party of the legislator, or on how much the prosecutor or even the people "resent[ed]" what the legislator allegedly did. *Tenney*, 341 U.S. at 373; *see, e.g.*, *United States v. Bannon*, No. 21-cr-00670 (D.D.C. July 11, 2022) (minute order) (quashing a subpoena issued to Speaker Pelosi); *Jud. Watch, Inc. v. Schiff*, 998 F.3d 989, 992–93 (D.C. Cir. 2021) (same for Congressman Schiff, despite arguments that his legislative activity "served no legitimate legislative purpose"); *Republican Nat'l Comm. v. Pelosi*, __ F. Supp. 3d __, 2022 WL 1294509, at *7–10 (D.D.C. May 1, 2022) (refusing to review the Select Committee's motivations in conducting January 6th investigation), *appeal pending*, No. 22-5123 (D.C. Cir. May 10, 2022). Nor does

the Clause turn on the alleged "subjective motivations of the legislators"; those are irrelevant. *In re Hubbard*, 803 F.3d 1298, 1310–11 (11th Cir. 2015). Rather, the Clause's protections turn only on "the question whether, stripped of all considerations of intent and motive, [the representative's] actions were legislative." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998).

**2.** Without speculating about Senator Graham's intent or motives, the District Attorney cannot show that the Senator's actions here were anything but "legislative."

Legislative actions extend to anything "generally done in a session of [Congress] by one of its members in relation to the business before it"; they thus include "every [] act resulting from the nature and in the execution of the [Senator's] office." *Kilbourn*, 103 U.S. at 203–04 (collecting historical sources). And, what's more, the legislative privilege "does not simply protect against inquiry into acts which are manifestly legislative," but "also forbids inquiry into acts which are *purportedly or apparently legislative*, even to determine if they are legislative in fact." *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973) (emphasis added); *accord McSurely v. McClellan*, 753 F.2d 88, 106 (D.C. Cir. 1985). Courts thus may "not go beyond the narrow confines of determining that a [legislator's] inquiry *may fairly be deemed within [his] province*." *Tenney*, 341 U.S. at 378 (emphasis added). If a representative's speech or activity is "apparently legislative" in this way, *Dowdy*,

8

479 F.2d at 226, the immunity against being forced to testify about it is "absolute," *Eastland*, 421 U.S. at 503:  The legislator "cannot be brought in question for [his] action in a court of justice or in any other place," *Kilbourn*, 103 U.S. at 200.

Because Senator Graham's phone-call "inquir[ies] may fairly be deemed within [his] province" as then-Chair of the Senate Judiciary Committee and as a United States Senator about to vote to certify a presidential election, they were "legislative," *Tenney*, 341 U.S. at 378—indeed, they were legislative in three ways.

*First*, a representative's inquiries or investigations about a topic on which legislation could be had—such as investigating possible "national standards" for mail-in voting[6] or reforms to the Electoral Count Act like those recently co-sponsored by Senator Graham—fall under the Speech or Debate Clause.  "Without information, Congress would be shooting in the dark, unable to legislate 'wisely or effectively,'" which is why "[t]he congressional power to obtain information is 'broad' and 'indispensable.'"  *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).  Thus, "the acquisition of information by Congress or congressional staff is generally an activity within the protection of the speech or debate clause," *Tavoulareas v. Piro*, 527 F. Supp. 676, 680 (D.D.C. 1981)—or, as the Supreme

---

[6]    NBC   News,   Video,   https://www.nbcnews.com/politics/2020-election/georgia-secretary-state-raffensperger-says-sen-graham-asked-him-about-n1247968 (Senator Graham statement regarding these calls).

Court has put it more bluntly, "[t]he power to investigate . . . plainly falls within th[e] definition" of 'Speech or Debate,'" *Eastland*, 421 U.S. at 504.  This case shows why:  Senator Graham's investigation led him to co-sponsor a bipartisan bill to amend the Electoral Count Act by (among other things) streamlining the process for determining disputed issues pertaining to presidential elections.[7]

*Second*, if more were needed, the Senator here was specifically exercising his oversight responsibilities as Chair of the Senate Judiciary Committee, including related to voting integrity and election-law issues.  *See, e.g.*, Ex. 2 ¶ 2 (alleging that the calls related to issues with "absentee ballots" and possible voting irregularities).  Investigation into and examination of past elections—and considerations of how best to address the challenges that arise from them—fall within the Senate Judiciary Committee's bailiwick, as past Committee practice demonstrates.  Committee Chairs of both political parties going back years have held hearings on, and have otherwise investigated, voting rights, voting integrity, and election-law legislation.  Last October, for example, Chairman Durbin held a hearing on The John R. Lewis

---

[7] Bipartisan Senate Group Strikes Deal to Rewrite Electoral Count Act, New York Times (July 20, 2022), https://www.nytimes.com/2022/07/21/us/politics/electoral-count-act-senate.html.

Voting Rights Advancement Act,[8] and in April 2021, Durbin held a hearing entitled

"Jim Crow 2021: The Latest Assault on the Right to Vote."[9]  In 2020, Chairman

Graham held a hearing entitled "Breaking the News: Censorship, Suppression, and

the 2020 Election."[10]  Earlier, Chairman Grassley held a hearing entitled "Russian

Interference in the 2016 United States Election."[11]  As these examples show, Senator

Graham's inquiry into voting integrity and election law was well within the Judiciary

Committee's province.  This ends the analysis:  The Supreme Court, to repeat, has

instructed courts "not [to] go beyond the narrow confines of determining that a

committee's inquiry may fairly be deemed within its province," *Tenney*, 341 U.S. at

377—as Senator Graham's conduct here indisputably was.

*Third*, Senator Graham's activities were also "legislative" because he was

investigating to adequately fulfill his duties under the Electoral Count Act—in the

---

[8] Protecting a Precious, Almost Sacred Right: The John R. Lewis Voting Rights Advancement Act, https://www.judiciary.senate.gov/meetings/protecting-a-precious-almost-sacred-right-the-john-r-lewis-voting-rights-advancement-act.

[9] Jim Crow 2021: The Latest Assault on the Right to Vote, https://www.judiciary.senate.gov/meetings/jim-crow-2021-the-latest-assault-on-the-right-to-vote.

[10] Breaking the News: Censorship, Suppression, and the 2020 Election, https://www.judiciary.senate.gov/meetings/breaking-the-news-censorship-suppression-and-the-2020-election.

[11] Russian Interference in the 2016 United States Election, https://www.judiciary.senate.gov/meetings/russian-interference-in-the-2016-united-states-election.

words of the District Attorney's pleading, he was investigating "allegations of widespread voter fraud." Ex. 2 ¶ 2. Under the Act, Senators must certify the validity of each State's electoral votes. U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. § 15 (detailing process under the Electoral Count Act). Before doing so, they are of course entitled—indeed, expected—to investigate and understand any disputed State's electoral process, and to resolve any concerns they or their constituents may have. Senators, in short, must ensure that the votes of state electors are genuine and proper, which necessarily requires them to consider whether state elections were safe and secure. And because the Act does not permit the introduction of evidence or testimony when considering the returns of a State, the best way for Senators to gather information about a State's process is to do just what the District Attorney says Senator Graham did: make phone calls to run down "allegations" that arise. Ex. 2 ¶ 2; *accord, e.g.*, 167 Cong. Rec. S20 (daily ed. Jan. 6, 2021) (statement of Senator Lee referencing spending "a lot of time on the phone with legislators and other leaders from the contested [election] states"). On their face, then, the calls helped Senator Graham gather the facts he needed to dispel those allegations—before he voted to certify Joe Biden as President. 167 Cong. Rec. S31 (daily ed. Jan. 6, 2021).

In these ways, Senator Graham was engaged in quintessentially legislative factfinding—both to help him form legislation and to help him vote on a pending

legislative matter under the Electoral Count Act. It should come as no surprise, then, that courts have held this kind of "field work" and "acquisition of knowledge through informal sources" is "essential to informed deliberation" and "a necessary concomitant of legislative conduct"—and is thus "within the ambit of the privilege." *E.g.*, *Ass'n of Am. Physicians & Surgeons v. Schiff*, 518 F. Supp. 3d 505, 517 (D.D.C. 2021), *aff'd sub nom. Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022) (quotations omitted).

The District Attorney's pleadings alone establish all of this. *See, e.g.*, *Eastland*, 421 U.S. at 506 (concluding, based on "the most cursory look at the facts presented by the pleadings" and public legislative record, that Speech or Debate Clause applied); *Tenney*, 341 U.S. at 376 (If, "from the pleadings[,] it appears that the [legislators] were acting in the sphere of legitimate legislative activity," their activity is absolutely privileged.). Public comments about Senator Graham's phone calls confirm it. Deputy Secretary of State Gabe Sterling, for example, explained that "[Senator Graham] had questions about our process,"[12] specifically how to verify signatures on absentee ballots and how courts might treat claims that they are

---

[12] Video Interview of Gabriel Sterling at 1:56, CNN Newsource (Nov. 18, 2020), https://bit.ly/3za979a.

not "truly matching."[13]  Senator Graham contemporaneously said the same thing: He was "asking questions" about "mail-in balloting [and] how to verify a signature," and was interested in looking at possible "national standards"[14]—something within his legislative purview.  Nor was Senator Graham alone with these concerns.[15]

After engaging in this privileged investigation, Senator Graham explained during debate on the Senate Floor that although some people "said the [Georgia] secretary of state took the law in his own hands" or acted "unlawfully," a "Federal judge said no[,] [and] I accept the Federal judge"; Joe Biden, Senator Graham thus explained, is "the legitimate President of the United States," and he "and Kamala Harris are lawfully elected and will become the President and the Vice President of the United States."  167 Cong. Rec. S31 (daily ed. Jan. 6, 2021).

---

[13] D. Gregorian, D. Clark, & The Associated Press, *Georgia officials spar with Sen. Lindsey Graham* (Nov. 17, 2020), https://nbcnews.to/3cmKJZb.

[14] NBC News, Video, https://www.nbcnews.com/politics/2020-election/georgia-secretary-state-raffensperger-says-sen-graham-asked-him-about-n1247968.  Senator Graham has been concerned about the security of election security, and absentee voting procedures specifically, since  long before the 2020 election.  *See*, *e.g.*, *Press Release: Senate Approves Another Graham-Backed Election Security Bill*, U.S. Senate Judiciary Comm. (July 19, 2019), available at https://bit.ly/2XiiaB1; Questioning by Sen. Graham, Barrett Confirmation Hearing, U.S. Senate Judiciary Comm. (Oct. 14, 2020), *available at* https://bit.ly/38okw7P.

[15] *See*, *e.g.*, 167 Cong. Rec. S20 (daily ed. Jan. 6, 2021) (statement of Senator Lee); *see also* 2020 S.C. Acts 133 (altering absentee ballot process for June 2020 primary); 2020 S.C. Acts 149 (changing absentee voting procedures for November 2020 election); Act 9, 2021 Ga. Acts 14, § 35 (amending election rules).

In sum, then, though the District Attorney may want to know more about "the substance of the telephone calls" and Senator Graham's "decision to make the[m]," Ex. 2 ¶ 3, the Speech or Debate Clause stands in her way:  because those calls were legislative acts by a U.S. Senator, testimony about them is constitutionally protected.

**3.**   Any suggestion about Senator Graham's intent for making the calls changes nothing about this analysis.  "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it," *Bogan*, 523 U.S. at 54, meaning "[t]he claim of an unworthy purpose does not destroy the privilege," *Tenney*, 341 U.S. at 377 (legislator allegedly singling out the plaintiff for investigation "to intimidate and silence [him] and deter and prevent him from effectively exercising his constitutional rights" was still acting in a legislative capacity).  Otherwise said, there is no peeking behind a legislative act to see if it is *really* legislative; "allegedly improper motives . . . are irrelevant with respect to determining the applicability of legislative immunity."  *Scott v. Taylor*, 405 F.3d 1251, 1256 n.7 (11th Cir. 2005).  Thus, any (baseless) speculation about the *reason* for Senator Graham's calls (for example, that he made them "to explore the possibility of a more favorable outcome for former President Donald Trump," Ex. 2 ¶¶ 2–3) does not transform them into non-legislative acts.  *Rangel*, 785 F.3d at 24.

This is not the first time that someone has suggested that a legislator has "los[t] sight of their duty of disinterestedness." *Tenney*, 341 U.S. at 377.  Courts, though, have held that the law protected the legislators all the same.  *See, e.g.*, *Johnson*, 383 U.S. at 180–81 (speech given allegedly to make money from the private sector, though "reprehensible," held protected under the Clause).  Especially "[i]n times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed." *Tenney*, 341 U.S. at 377.  But "[c]ourts are not the place for such controversies.  Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such [perceived] abuses." *Id.*  All courts may do is ask whether a legislator's conduct "may fairly be deemed within [the legislative] province." *Id.*  "To find that a [legislator's] investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive." *Id.*; *see Dowdy*, 479 F.2d at 226.  Because "[t]he present case does not present such a situation," this Court must quash the subpoena. *Tenney*, 341 U.S. at 377–78.

**4.**  Finally, the District Attorney may rely on *Gravel v. United States*, 408 U.S. 606 (1972), to insist that Senator Graham's constitutional protections drop away simply because his testimony would be used to investigate supposed "third-party criminal conduct." *In re Subpoena for Attendance of Witness (Hice)*, No. 22-cv-

02794 (N.D. Ga.) (Doc. 8 at 4–5, District Attorney's Response to Motion to Quash). But this overbroad reading of *Gravel*—and overly restrictive reading of the Speech or Debate Clause—is contrary to precedent, not to mention the text and purpose of the Clause. There is no "third-party criminal conduct" exception to the Clause.

As for precedent, both *Gravel* and its progeny show that Senator Graham's legislative activity is protected. *Gravel* itself found it "incontrovertible" that the Clause "at the very least protects [Senators] from . . . questioning elsewhere than in the Senate" for their legislative activity, which includes actions taken in preparation for a committee hearing. 408 U.S. at 615–16. True, the Court held that "republication of an otherwise immune libel on the floor of the House"—in *Gravel*, stealing classified national security materials (the top-secret Pentagon Papers) and conspiring to publish them outside of Congress—is not protected "legislative activity." *Id.* at 623, 627–29. But that holding has no relevance here, where Senator Graham exercised his duties as Senator and Committee Chair to investigate voting integrity and irregularities before voting to certify Joe Biden as President.

Binding cases, moreover, have since confirmed that *Gravel* does not sweep as broadly as the District Attorney has suggested in other proceedings. Reasoning that "[o]ne of the privilege's principle purposes is to ensure that lawmakers are allowed to 'focus on their public duties,'" the Eleventh Circuit has held that the Speech or

Debate "privilege extends to discovery requests[] even when the lawmaker is not a named party in the suit: complying with such requests detracts from the performance of official duties." *Hubbard*, 803 F.3d at 1310. Other courts, including the Supreme Court, have likewise refused to read *Gravel* broadly because to do so would undermine the Speech or Debate Clause guarantee of protection for legislative action. *See Dowdy*, 479 F.2d at 225 n.20 (refusing to read *Gravel* broadly so that the "exceptions would [not] engulf the rule"); *see also, e.g.*, *Eastland*, 421 U.S. at 504, 507–08. *Gravel* thus stands at most for the proposition that a grand jury may question a representative if its criminal inquiry "focuses on the *manner and methods*" by which the representative illegally came to his information—*e.g.*, when the allegation is that the Senator stole or received "stolen classified papers." *Dowdy*, 479 F.2d at 225 n.20; *see McSurely*, 753 F.2d at 106. *Gravel* does not allow a more freewheeling inquiry into a Senator's investigations and factfinding, even when another's allegedly criminal conduct is involved. *Id.*[16]

---

[16] Even if *Gravel* were read that broadly, it still would not apply because "[t]his is not a *federal* criminal investigation or prosecution," which is the only time *Gravel*'s supposed exception could even conceivably apply. *Hubbard*, 803 F.3d at 1312 (emphasis added); *accord Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 30 (1st Cir. 1996) (refusing to extend *Gravel* beyond "*federal criminal prosecution[s]*"). Indeed, this *state* body is *not even a traditional grand jury*; it cannot indict but rather can only investigate and render non-binding recommendations. *See Kenerly*, 715 S.E.2d at 690.

And for good reason:  The text of the Speech or Debate Clause contains no sweeping exception of the sort urged by the District Attorney.  To the contrary, the text is categorical, protecting Senators from being "questioned in *any* [] place" for "*any* Speech or Debate."  U.S. Const. art. I, § 6, cl. 1 (emphasis added).  If the Framers wanted to carve out questioning for third-party cases or third-party criminal cases, they certainly could have done so.  But they decided instead to protect, without exception, *any* Speech or Debate in *any* place.

No surprise, then, that the sort of exception envisioned by the District Attorney would be contrary to the Clause's purpose of protecting the legislative process, because that purpose applies whether the legislator is called to testify in a criminal or civil case, in his own case or someone else's.  *Hubbard*, 803 F.3d at 1310; *see Eastland*, 421 U.S. at 501 (consulting purpose in interpreting the Clause).  The whole point of the Clause is to prohibit questions into the legislator's activity except where those questions belong:  on the House or Senate floor.  The "integrity of the legislative process" and "the independence of individual legislators" are no less threatened when a Senator is forced to testify about his legislative activity as it relates to a third-party criminal case as when it relates to any other kind of case.  *See id.*  Either way, compelling the Senator's testimony subjects him to precisely "the cost and inconvenience and distractions" that the Constitution ensures against.

19

*Tenney*, 341 U.S. at 377; *see Hubbard*, 803 F.3d at 1310.   And, either way, compelling that testimony allows "intimidation" by a hostile prosecutor and a "possibly hostile judiciary"—and the concomitant chilling of legislative activity that comes with that possibility—intruding on the independent legislative branch in a way that violates the Speech or Debate Clause.  *Johnson*, 383 U.S. at 180–81.

The District Attorney's approach, in short, would deprive the Clause of much of its force, contrary to precedent, text, and purpose.  The Court should reject it.

## II.   SOVEREIGN IMMUNITY ALSO PRECLUDES ENFORCEMENT OF THE CERTIFICATE AND SUBPOENA.

Senator Graham's activity would be protected regardless of who sought testimony about it.  But because a state attorney is seeking to have Senator Graham testify about actions undertaken in his official capacity and pursuant to his official duties, Senator Graham's testimony is doubly protected—not only by the Speech or Debate Clause but also by the federal government's sovereign immunity.

Absent an express waiver, sovereign immunity shields the federal government and its officials from suit or other judicial proceedings.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The federal government has not waived immunity to allow federal officials to testify in state court.  Thus, "[i]n a number of [] cases which involved state court subpoenas being challenged in federal court, sovereign immunity [has been] used as grounds to quash

a subpoena of a federal employee" to testify.  *Moore v. Armour Pharm. Co.*, 129 F.R.D. 551, 555 (N.D. Ga. 1990), *aff'd*, 927 F.2d 1194 (11th Cir. 1991) (collecting cases).  These cases hold that "[t]he doctrine of sovereign immunity precludes [a] state court—and [a] federal court which gained limited jurisdiction upon removal— from exercising jurisdiction to compel [a federal official] to testify."  *Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989); *see, e.g.*, *West Coast Grp. Enterp. v. Darst*, 561 F. Supp. 3d 1180, 1184 (N.D. Fla. 2021) (dismissing claim based on sovereign immunity because under Section 1442, "upon removal, the federal district court acquires only the jurisdiction that was originally vested in the state court").  Courts around the country agree.  *See, e.g.*, *Houston Bus. Journal, Inc. v. Office of the Comptroller of the Currency*, 86 F.3d 1208, 1211 (D.C. Cir. 1996).

The same result follows here.  Because there was no waiver, and because Senator Graham is a federal official, this Court must quash the subpoena.

## III.   THE DISTRICT ATTORNEY FAILS TO SHOW ANY EXCEPTIONAL CIRCUMSTANCES TO PERMIT SENATOR GRAHAM'S TESTIMONY ANYWAY.

Even if the Speech or Debate Clause and sovereign immunity did not bar the subpoena here, the "settled rule" that high-ranking government officials cannot be ordered to testify absent extraordinary circumstances would do so.  *Coleman v. Schwarzenegger*, 2008 WL 4300437, at *2 (E.D. Cal. Sept. 15, 2008) (three-judge

district court panel) (collecting cases). "[T]he Supreme Court has indicated that the practice of calling high officials as witnesses should be discouraged." *In re United States (Kessler)*, 985 F.2d 510, 512 (11th Cir. 1993); *see United States v. Morgan*, 313 U.S. 409, 422 (1941). Implementing this standard, the Eleventh Circuit holds that anyone wanting to force a high-ranking official to testify must "show a special need or situation compelling such testimony." *Kessler*, 985 F.2d at 512–13 (granting mandamus to order the district court to quash the subpoena).

As a U.S. Senator and former Chair of the Senate Judiciary Committee, Senator Graham qualifies as a high-ranking official under this test. *See, e.g.*, *Moriah v. Bank of China Ltd.*, 72 F. Supp. 3d 437, 440–41 (S.D.N.Y. 2014) (House Majority Leader); *McNamee v. Massachusetts*, 2012 WL 1665873, at *1–2 (D. Mass. May 10, 2012) (Congressman); *Springfield Terminal Ry. Co. v. United Transp. Union*, 1989 WL 225031, at *2 (D.D.C. May 18, 1989) (ranking Minority Member of the House Appropriations Committee). Senator Graham, therefore, may not be ordered to testify unless the District Attorney demonstrates "extraordinary circumstances" that "compel[] such testimony." *Kessler*, 985 F.2d at 512–13.

The District Attorney comes up woefully short. For one thing, this Court may not find extraordinary circumstances when similar "testimony was available from alternate witnesses," as it is here. *Kessler*, 985 F.2d at 512–13; *see In re USA*, 624

F.3d 1368, 1372 (11th Cir. 2010) (following this holding); *see also In re U.S. Dep't of Educ.*, 25 F.4th 692, 700 (9th Cir. 2022) ("The 'duties of high-ranking [government] officers should not be interrupted by judicial demands for information that could be obtained elsewhere.'" (quoting *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per curiam))).  The District Attorney says she wants to learn about "the substance of the telephone calls" and the "logistics of setting [them] up," Ex. 2 ¶ 3, but that information could easily be obtained from the other people on the calls— who already have or soon will testify in front of this very body.  All that is left, and all the District Attorney appears to be after, is testimony about Senator Graham's *motives* for "mak[ing] the telephone calls," *id.*—information that is squarely protected by the Speech or Debate Clause and that, in any event, cannot plausibly be deemed so "extraordinar[ily]" important as to justify forcing a sitting Senator to testify before a county grand jury.  *See Hubbard*, 803 F.3d at 1310.

Nor, in any event, does the District Attorney satisfy the other requirements for her extraordinary-circumstances showing.  Courts have required not only that "the information sought from the [official] cannot be obtained in any other way," but also "a showing of [official] bad faith" *and* that "the information sought from the [official] is essential to the case"—neither of which is met here.  *In re U.S. Dep't of Educ.*, 25 F.4th at 702.  The District Attorney does not allege bad faith by Senator

23

Graham, and indeed has made clear that Senator Graham is not a target or a subject of the special grand jury.  And although the District Attorney says she wants it, she cannot seriously argue that Senator Graham's cumulative testimony, about two short phone calls, is *essential* to her case.  *See, e.g.*, *Stevens v. Holder*, 2014 WL 12798976, at *6 & n.12 (N.D. Ga. June 30, 2014).

Of note here too, neither the Certificate nor the Subpoena purports to find any extraordinary circumstances for Senator Graham's testimony.  *See generally* Exs. 1, 3.  Indeed, they do not even mention the extraordinary-circumstances test.  And the District Attorney's petition, far from alleging extraordinary circumstances, underscores that they do not exist:  She admits that she already has information about the two phone calls "[t]hrough both [the] investigation and through publicly available information," including through interviews of Secretary "Raffensperger and members of his staff in the weeks following the 2020 election."  Ex. 2 ¶ 2.  The District Attorney is thus light years short of showing extraordinary circumstances.[17]

*　　*　　*

---

[17] At the very least on extraordinary circumstances, the District Attorney has to do much more than what she has done to this point—which is leave unsaid, *e.g.*, (1) what exact testimony Senator Graham could provide that might be essential to the Special Purpose Grand Jury's investigation and (2) why the same information could not be provided by other witnesses.  *See, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, 333 F.R.D. 689, 698 (N.D. Ga. 2019) (examining extraordinary circumstances only after being provided with specific proposed topics).

Judicial enforcement of the Subpoena would pose a "threat to the separation of powers," which is bad enough.  *In re USA*, 624 F.3d at 1373.  A federal court would be ordering a U.S. Senator from a coequal branch of government to appear before a grand jury.  And enforcement would pose an even larger problem:  It would create a precedent that would allow other county officials in locales across the nation to impose similar burdens on federal officials, of whatever party, to the detriment of our federal government and the federalism that protects it from state and local interference.  And to what end?  There is no need for Senator Graham's testimony, far less "extraordinary circumstances" compelling it.  All roads thus lead to quashal.

## CONCLUSION

For these reasons, this Court should quash the *ex parte* Certificate and Subpoena purporting to require Senator Graham's appearance in any Georgia special grand jury proceedings.

Date: July 29, 2022                       Respectfully submitted,

                                          /s/ Brian C. Lea
                                          _____
DONALD F. MCGAHN II                       BRIAN C. LEA
  *Application for admission*             Georgia Bar No. 213529
  *pro hac vice forthcoming*              JONES DAY
ROBERT LUTHER III                         1221 Peachtree Street, N.E.,
  *Application for admission*             Suite 400
  *pro hac vice forthcoming*              Atlanta, Georgia 30361
JONES DAY                                 (404) 521-3939
51 Louisiana Ave., NW                     blea@jonesday.com
Washington, DC 20001
(202) 879-3939                            E. BART DANIEL
dmcgahn@jonesday.com                        *Application for admission*
rluther@jonesday.com                        *pro hac vice forthcoming*
                                          MARSHALL T. AUSTIN
                                            *Application for admission*
                                            *pro hac vice forthcoming*
                                          NELSON MULLINS RILEY &
                                            SCARBOROUGH LLP
                                          151 Meeting Street,
                                          Suite 600
                                          Charleston, SC 29401
                                          (843) 853-5200
                                          bart.daniel@nelsonmullins.com
                                          matt.austin@nelsonmullins.com


*Counsel for United States Senator Lindsey Graham*

26

## <u>CERTIFICATE OF COMPLIANCE WITH LR 5.1(B)</u>

I hereby certify that this brief has been prepared with one of the font, point, and style selections approved by the Court in LR 5.1(B)—namely, double-spaced in 14-point Times New Roman font.

Date: July 29, 2022

*/s/ Brian C. Lea*
BRIAN C. LEA
Georgia Bar No. 213529
JONES DAY
1221 Peachtree Street, N.E.,
Suite 400
Atlanta, Georgia 30361
(404) 521-3939
blea@jonesday.com

*Counsel for United States Senator Lindsey Graham*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2022, I caused a copy of the foregoing to be

served via U.S. Mail on the following recipients:

> Fani T. Willis
> Fulton County District Attorney's Office
> 136 Pryor Street SW
> 3rd Floor
> Atlanta, Georgia 30303

Date: July 29, 2022                           /s/ Brian C. Lea

Brian C. Lea
Georgia Bar No. 213529
JONES DAY
1221 Peachtree Street, N.E.,
Suite 400
Atlanta, Georgia 30361
(404) 521-3939
blea@jonesday.com

*Counsel for United States Senator Lindsey Graham*