## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE: SUBPOENA TO NON-PARTY
LINDSEY O. GRAHAM in his official
capacity as United States Senator,

In the matter of:                                        CIVIL ACTION NO.
                                                         1:22-cv-03027-LMM

SPECIAL PURPOSE GRAND JURY,
FULTON COUNTY SUPERIOR
COURT CASE NO. 2022-EX-000024

## RESPONSE IN OPPOSITION
## TO SENATOR LINDSEY O. GRAHAM'S SUPPLEMENTAL MOTION

Following this Court's denial of both his motion to quash the subpoena issued to him by the Fulton County Special Purpose Grand Jury and his Motion to Stay proceedings pending appeal, Senator Lindsey O. Graham filed a second Motion to Stay in the Eleventh Circuit Court of Appeals. The Eleventh Circuit granted a temporary stay in order for this Court to address the question of whether Senator Graham is entitled to "partial quashal" of his subpoena. This Court ordered the Senator to brief the issue and ordered the District Attorney to respond. In short, Senator Graham's repetition of his previous arguments does not entitle him to partial quashal, and the District Attorney respectfully requests that his motion be denied.

## ARGUMENT

For the third time in a single month, Senator Lindsey Graham has presented arguments to this Court insisting that it must entirely quash the subpoena issued to him by the Fulton County Special Purpose Grand Jury. In this third iteration of Senator Graham's arguments, just as in the prior two, there is no role for this Court other than to serve as a rubber stamp for his own conclusions. Even in a motion purportedly requesting partial quashal, Senator Graham insists that each and every possible topic of grand jury inquiry is forbidden. In so doing, the Senator ignores the facts that have been presented, the findings of this Court, and the historic limitations placed upon the Speech or Debate Clause by the Supreme Court. Because the subpoena *does not require* the disclosure of privileged or other protected matter, this Court should deny the Senator's motion.

### A. The Phone Calls and "Investigative" Activity

Provided with an opportunity to demonstrate to this Court that his subpoena should be narrowed or partially quashed, Senator Graham has decided to once again argue that every avenue of inquiry available to the Special Purpose Grand Jury requires quashal. Because Senator Graham largely repeats the same arguments he has already presented, he has failed to respond to this Court's own findings. The most glaring example of this is the heart of the Senator's position: that his phone calls to Secretary Raffensperger were, by the nature, inherently

legislative acts, and the Special Purpose Grand Jury's inquiry actually only contemplates the phone calls. This is precisely the opposite of what this Court has found: "the specific activity at issue involves a Senator from South Carolina making personal phone calls to state-level election officials in Georgia concerning Georgia's election processes and the results of the state's 2020 election. On its face, such conduct is not a 'manifestly legislative act.'" Doc. 27 at 12. "Over and again, the District Attorney has demonstrated an intention to question Senator Graham on issues that are not related to the phone calls themselves and—even more importantly—are not related to legitimate legislative activity as defined by the Supreme Court." Doc. 37 at 7. The Senator has no response to this, except to insist once again that actually, the calls *are* manifestly legislative in their entirety because he later performed his duties under the Electoral Count Act[1], and that any disagreement about their nature devolves to questions of implications and

_____

[1]    As the District Attorney has previously argued, Doc. 18 at 17 n.15, the Senator's suggestion that the phone calls were legislative because he later held an elections-related hearing of the Judiciary Committee cannot withstand even casual scrutiny: the one hearing conducted by the Senator concerning the election called the executives of Facebook and Twitter as witnesses in order to discuss "censorship" of opinions on social media. No serious contention can be made that this hearing had anything to do with Movant's phone calls to Secretary Raffensperger. Similarly thin is the Senator's argument that his conversation with Raffensperger about idiosyncrasies of signature verification in Georgia, or about an upcoming runoff election, was an obvious precursor to his eventual co-sponsoring of a bill altering certification procedures under the Electoral Count Act. *See* Doc. 40-1 at 6. It is not clear at all how changing Senate procedures under the Act "correct[s] flaws he discovered during his investigation."

motivations. But this too was addressed in this Court's order denying the motion to quash: "the Court cannot simply accept Senator Graham's conclusory characterizations of these calls and reject others'—indeed, such an approach has been expressly rejected by other courts facing the same issue." Doc. 27 at 13.

The only arguments advanced by Senator Graham that do not ignore the findings of this Court concern the nature of "informal investigative inquiries by individual members of Congress." The Senator argues that the phone calls are part of his individual investigation, that such investigations are clearly protected under the Speech or Debate Clause, and that therefore any questions about the phone calls should be forbidden. Doc. 40-1 at 9-13.

First, the District Attorney observes that the Supreme Court has never settled this question. While formal, authorized congressional investigations have received protection under the Speech or Debate Clause in most circumstances, "[t]he question of whether *informal* investigations and information-gathering [are] equally covered, however, is less clear." *Williams v. Johnson*, 597 F. Supp. 2d 107, 114 (D.D.C. 2009) (emphasis original). Federal courts "are divided on the question[]" of whether the Speech or Debate Clause "covers *informal* information gathering by Members [of Congress] or their staff." *Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 55 (D.D.C. 2007) (emphasis original). In discussing the so-called "informing function" of Congress, the Supreme Court has

"concluded that the term described 'congressional efforts to learn of the activities of the Executive Branch and administrative agencies,' rather than 'wide-ranging inquiries by individual Members on subjects of their choice.'" *Id.*, citing *Hutchinson v. Proxmire*, 443 U.S. 111, 132 (1979); *see also Bastien v. Off. of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1315 (10th Cir. 2004).

However, even if *informal* investigations by individual members of Congress are protected under the Speech or Debate Clause, the record does not establish that the phone calls were a part of any such investigation by Senator Graham. There is, of course, the matter of Secretary Raffensperger's understanding of what the calls were actually about, which he has maintained consistently and repeatedly.[2] No less significant are the corroborative statements of Gabriel Sterling. Sterling said Raffensperger was "correct" and that Senator Graham brought up the signature verification process in order to explore the viability of a "potential court challenge," *not possible or proposed legislation*. Inquiring into possible routes of litigation, whether pursued by another state's

---

[2]     "Mr. Raffensperger said that when he was contacted by Mr. Graham Friday, he thought the senator was calling about the state's two senate races. After an initial conversation, Mr. Graham called back again and brought up the idea of invalidating absentee ballots from counties with higher rates of signature errors, Mr. Raffensperger said, adding that he had staffers with him on that call." Alexa Corse, "Georgia's GOP Secretary of State at Odds With GOP Senator Graham Over Counting Ballots," *Wall Street Journal*, Nov. 16, 2020, found at https://www.wsj.com/livecoverage/latest-updates-biden-trump-election-2020/card/w1UKQ1j1coZcJflTu6kf.

elections officials or by the Trump Campaign itself, cannot *possibly* fall within the ambit of "manifestly legislative activity" protected by the Clause. In addition, as the District Attorney has previously observed, the Senator's own statements fail to establish a legislative purpose to the conversation. Senator Graham explicitly told reporters that he had tried to persuade Raffensperger to adopt a different method of signature verification, one which the Senator preferred to the method being used at the time in Georgia. He went further to say that he wanted to discuss how Raffensperger could make the process "better," explicitly not for some future legislative purpose, but to alter either the ongoing recounts or the upcoming Senate runoff elections.[3] Against these facts, the Senator offers only conclusory arguments that the phone conversations involved legislative factfinding, and legislative factfinding alone.

Aside from dismissing the publicly available statements from the actual participants on the call (including his own), Senator Graham's arguments regarding the nature of the telephone calls also entirely ignore the context in which the calls were made. Senator Graham was not the only person with signature verification on their minds on November 13, 2020. On the very same day that the Senator called

---

[3]     *See* Video, https://www.nbcnews.com/politics/2020-election/georgia-secretary-state-raffensperger-says-sen-graham-asked-him-about-n1247968; Video, https://archive.org/details/CNNW_20201118_010000_Anderson_Cooper_360/start/2400/end/2460.

Secretary Raffensperger, attorney Lin Wood filed a filed a federal suit against

Raffensperger and the Georgia State Election Board. Wood's lawsuit concerned a

settlement agreement between the State of Georgia and the Georgia Democratic

Party that had established procedures for notifying voters about problems with the

verification of their signatures on absentee ballots.[4] Then, as Raffensperger has

recalled:

> Later that day, Senator Lindsey Graham (R-SC) called me to ask
> about our signature match procedure. I didn't understand why Senator
> Graham would interject himself into a neighboring state's affairs. He
> seemed to be concerned that some counties might have approved
> absentee ballot signatures that should have been marked invalid, and
> he seemed to imply that we could audit all signatures and throw out
> the ballots from counties that had the highest frequency of error rates.
> But no state can do that.[5]

Secretary Raffensperger's recollection of the Senator's "interjection" into Georgia

affairs, to say nothing of his recollection of the Senator's suggestions for

discarding ballots from entire counties, does not support the Senator's

characterization of the conversation as a product of his own curiosity or staid,

legitimate legislative investigation.

Still later on that same day, former President Trump tweeted "Georgia

Secretary of State, a so-called Republican (RINO), won't let the people checking

the ballots see the signatures for fraud. Why? Without this the whole process is

---

[4]     Brad Raffensperger, *Integrity Counts*, 113 (2021).
[5]     *Id.* at 114.

very unfair and close to meaningless. Everyone knows that we won the state. Where is [Governor Brian Kemp]?"[6] Secretary Raffensperger did not fail to note the significance of a lawsuit by one of the former president's allies being filed on the same day as telephone calls from the Senator, another of his allies, followed by a statement by Trump himself, all focusing on the same issue. As Raffensperger put it, "It was clear to me that Senator Graham and Lin Wood, both of whom are lawyers, as well as President Trump, were all on the same page, and they didn't understand Georgia's laws regarding absentee ballots."[7] The Senator opts to ignore his public entanglement with the political interests of the former president, his Campaign, and the claims made by both, entanglement which continues to the present day.[8]

The Senator's repeated insistence that the calls were part of a legitimate legislative investigation and absolutely nothing else ignores this context, as well as the inherently inappropriate (and neither legitimate, ordinary, nor traditionally legislative) nature of the phone calls themselves. A November 18, 2020, letter from Walter M. Schaub, Jr., the former Director of the U.S. Office of Government Ethics, does not mince words:

> On its face, [Senator Graham's] explanation suggests misconduct. Any call by a sitting chairman of the Senate Judiciary Committee to a

---

6   *Id.*
7   *Id.*
8   *See* https://www.nytimes.com/2022/08/25/magazine/jones-day-trump.html.

state election official during an ongoing count of votes is inherently coercive and points to an attempt to influence the outcome of the ballot counting. The allegation that Senator Graham placed a behind-the-scenes call to a member of his own political party, without having launched a formal investigation, suggests that he hoped to act out of public view. Even if your committee were to reject Secretary Raffensperger's allegation regarding the content of the communication, the conduct Senator Graham has admitted is deeply troubling. There can be no legitimate reason for the Judiciary Committee's chairman to call a top election official regarding an ongoing vote count.[9]

After noting that former President Trump's tweet about signature verification came on the very same day, Schaub reiterates, "Even if the Senate Select Committee on Ethics were to reject Secretary Raffensperger's account, the conduct to which Senator Graham has overtly admitted is shocking from the standpoint of both professional and personal ethics. There was no legitimate reason for the Judiciary Committee's chairman to call a top election official regarding an ongoing vote count." In a comment foreshadowing the Senator's ongoing attempts to conflate personal and political activities with legislative ones, Schaub observed that he had "obliterated the distinction between personal capacity political opinions and official actions with respect to this particular election controversy."

Thus, in order to conclude that the phone calls were comprised entirely of sanctioned legislative factfinding, one would have to ignore

---

[9]     *See* Letter of Claire O. Finkelstein, Richard W. Painter, and Walter M. Schaub, Jr., found at https://www.law.upenn.edu/live/files/11121-ethics-complaint-against-senator-lindsey-o-graham.

9

- Secretary Raffensperger's consistent, repeated recollections of the Senator's statements on the call;
- Mr. Sterling's corroboration of Raffensperger, as well as his recollection that the Senator was inquiring about prospective routes of litigation to challenge election results in Georgia, as well as about the upcoming Senate runoff elections (rather than proposed legislation);[10]
- The Senator's own statements to the media in the aftermath of the calls;
- The simultaneous interest in the hyper-specific topic of Georgia's signature verification procedures from attorney Lin Wood and former President Trump; and
- At the most basic level, the transparently coercive and inappropriate nature of the Senator's contact with another state's elections official in the midst of a recount, particularly given the Senator's outspoken and vehement public advocacy for his political ally, who was of course one of the interested parties in the recount and who was personally and publicly attacking Secretary Raffensperger at the time.

Against this, one must weigh Senator Graham's insistence in this litigation that the phone calls were legislative factfinding because he later voted as required under the Electoral Count Act.

The record simply does not support the Senator's argument, certainly not with sufficient weight to justify total quashal or even partial quashal targeting all inquiry regarding the phone calls. The record justifies, at most, the approach already proposed by this Court: that the Senator should appear for questioning, while any disputes as to routes of inquiry or specific questions can be supervised

---

[10]     As it has noted before, the District Attorney's Office will make additional corroborative information, gathered in the course of the Special Purpose Grand Jury's investigation, available to this Court for *in camera* review if this Court orders it to do so.

by this Court.[11] The record does not even support Senator Graham's arguments for partial quashal (such as they are) because, as this Court has noted, "carefully framed questions" could avoid any prohibited inquiries without implicating the Speech or Debate Clause at all. Doc. 27 at 14. As a result, the Senator's arguments that the phone calls were entirely comprised of legislative investigation and that the subpoena contemplates only the phone calls and nothing else both fail. The subpoena therefore does not "require" any protected or privileged information under Rule 45(d)(3), both because questions may be framed to avoid any such information *and* because the record does not establish that any such protection or privilege even applies, and the Senator is not entitled to partial quashal under the Rule.

### B. Other Topics

---

[11]    The method suggested by this Court draws upon the well-established method of inquiry defined by the Third Circuit in *Gov't of the Virgin Islands v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985). While the Senator continues to rely upon *United States v. Dowdy*, 479 F.2d 213, 226 (4th Cir. 1973) for the proposition that inquiry is forbidden into acts which are merely "purportedly or apparently legislative, even to determine if they are legislative in fact," *Dowdy* was distinguished by the Third Circuit in *Lee* and read narrowly in light of the Supreme Court's holdings on the scope of the Speech or Debate Clause. There is no indication that the Speech or Debate Clause has degraded into uselessness within the Third Circuit in the decades since *Lee* was decided. As the Third Circuit more recently summarized, "legislative immunity does not bar an inquiry into whether a legislator's activities and conversations were, in fact, legislative in nature." *United States v. James*, 888 F.3d 42, 48 (3d Cir. 2018) (citing *Lee*, 775 F.2d at 517).

Senator Graham's remaining arguments are again repetitive and have already been addressed by this Court in its orders. First, the Senator again insists that questions having nothing to do with the phone calls are merely (and "admittedly") "backdoor ways to question" the Senator about his legislative motivations. Doc. 40-1 at 17-18. The Court has dismissed this concern: "[t]he problem for Senator Graham is that the record thoroughly contradicts his suggestion that the District Attorney and grand jury simply wish to use questions on other topics as a 'backdoor' to asking him about the legislative fact-finding on the phone calls." Doc. 38 at 7-8; Doc. 27 at 9 (possible routes of inquiry falling outside the phone calls).

Senator Graham next argues that cajoling state-level executive branch officials to implement their laws in accordance with the Senator's preferences is actually protected legislative activity, and that if it is not, it should be. Doc. 40-1 at 19. Recognizing that this Court may opt not to flout decades of Supreme Court precedent, Senator Graham then insists that "[t]he District Attorney's only evidence of 'cajoling' is Secretary Raffensperger's subjective assessment that, in making his calls about electoral process, Senator Graham really wanted Secretary Raffensperger to throw out ballots." *Id.* Of course, this ignores the Senator's own statement to the media indicating that he had pressed Raffensperger to alter Georgia's processes. It also ignores this Court's holding that questions about

attempts to cajole Secretary Raffensperger are unquestionably outside the scope of Clause protection. Doc. 27 at 15-16. The same can be said regarding the Senator's arguments regarding his own public statements, *see* Doc. 40-1 at 18-19, which are unquestionably subject to questioning. Doc. 27 at 8-9.

Senator Graham also claims that questions involving the senatorial runoff elections are necessarily beyond the scope of the Special Purpose Grand Jury's authority to investigate. First, as a Senator, he is entitled to cajole state officials regarding senatorial elections. This does not hold, however; Art. I, § 5, cl. 1 of the Constitution only allows Members of Congress to determine whether constitutional requirements such as age and residence have been met by other members. *Powell v. v. McCormack,* 395 U.S. 486, 522 (1969). That clause therefore offers no authority at all to a sitting Senator to micromanage another state's signature verification processes. Failing this, the Senator suggest that the runoff elections, which took place on January 5, 2021, were somehow not related "directly or indirectly" to the 2020 elections in Georgia. This argument is risible. The runoff elections were the *literal culmination* of the 2020 elections in Georgia.

Finally, the Senator makes his grandest argument of all: "this same analysis applies to any other topic this Court, the District Attorney, or Amici can invent, such as media appearances." Doc. 40-1 at 22. If the topic involves the 2020 elections, it is an impermissible back door to questions about motives; if it does

not, it falls outside the scope of the investigation. Thus, we finally arrive at the place where we began: the Senator's arguments for partial quashal inevitably slide into an argument for total quashal. By the end of his argument he simply dispenses with the pretense that he finds any possible topic of inquiry acceptable; literally all topics (phone calls or not, public statements or not, efforts to cajole or not, etc) are off limits. He stands above the power to be questioned. Because he cast a vote as required of him under the Electoral Count Act, he can take any action he likes with regard to the executive branch, and he cannot ever be ordered to answer questions about those actions by the judicial branch, so long as he merely asserts that, actually, it all stemmed from his legislative duties. This Court can therefore cease wondering how closely the Senator gets to wading into the troublesome waters described by Justice Stephens in *United States v. Helstoski*, 442 U.S. 477, 488 n.7 (1979) (*see* Doc. 27 at 15) or the Supreme Court's warnings about "super-citizens." *See* Doc. 38 at 14. The Senator has finally jumped into those waters with both feet.

## CONCLUSION

The District Attorney asks once again that this Court deny Senator Graham's motion in order that he can appear before the Special Purpose Grand Jury. The Senator has not identified any protected or privileged information that is "required" by his subpoena and has instead insisted, not for the first time, that

14

he cannot be subject to questioning in any way, much less in some "partial" way. The Senator's extreme position defies the facts, this Court's holdings, Supreme Court precedent, and the interests of the public. The District Attorney, on behalf of the Special Purpose Grand Jury, requests that his motion be denied.

Respectfully submitted, this 29th day of August 2022.

FANI T. WILLIS
DISTRICT ATTORNEY
ATLANTA JUDICIAL CIRCUIT


By:


By: ~~s/ F. McDonald Wakeford~~
F. McDonald Wakeford
Chief Senior Assistant District Attorney
Atlanta Judicial Circuit
Georgia Bar No. 414898
136 Pryor Street SW, Third Floor
Atlanta, Georgia 30303
fmcdonald.wakeford@fultoncountyga.gov

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this pleading complies with the Local Rules of this Court, including Local Rules 5.1.C and 7.1.D (N.D. Ga.) in that it is double-spaced and composed in 14-point Times New Roman font.

This 29th day of August 2022.


<u>CERTIFICATE OF SERVICE</u>

I hereby certify the foregoing was served upon the following by email:

BRIAN C. LEA
Georgia Bar No. 213529
JONES DAY
1221 Peachtree Street, N.E.,
Suite 400
Atlanta, Georgia 30361
(404) 521-3939
blea@jonesday.com


Dated this 29th day of August, 2022.

*s/ F. McDonald Wakeford*

F. McDonald Wakeford

16